UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNA FAYE MIRANDA,<br><br>Plaintiff,<br><br>v.<br><br>Commissioner of Social Security,<br><br>Defendant. | No. 1:22-cv-01342-GSA<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF**<br><br>**(Doc. 14, 17)** |

### I. Introduction

Plaintiff Joanna Faye Miranda appeals the decision of the Commissioner of Social Security denying her application for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI, respectively, of the Social Security Act.[1]

### II. Factual and Procedural Background

On April 8, 2019 Plaintiff applied for DIB and SSI alleging disability as of October 11, 2017. AR 14, 217–18. The applications were denied initially and on reconsideration. AR 63, 122. The ALJ held a hearing on November 5, 2020. AR 33–62. On September 15, 2021 the ALJ issued an unfavorable decision. AR 11–32. The Appeals Council denied review (AR 1-6) and this appeal followed.

### III. The Disability Standard

Under 42 U.S.C. §405(g), this court has the authority to review the Commissioner's denial of disability benefits. Reversal is appropriate when the ALJ's findings are based on legal error or unsupported by substantial evidence." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999). Substantial evidence is that which could lead reasonable minds to accept a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996).

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. Docs. 8, 9.

1

The court must consider the record as a whole, not isolate a specific portion thereof. *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

A disability claim is evaluated using a five-step analysis.  20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).  While the Plaintiff bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience.  *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

### IV. The ALJ's Decision

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of October 11, 2017. AR 17. At step two the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the cervical, thoracic, and lumbar spine; history of bilateral carpal tunnel syndrome status post release. AR 17. The ALJ also determined at step two that Plaintiff had the non-severe impairment of uterine fibroids. *Id.*

At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 18-19.

Prior to step four the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) with occasional postural activities and frequent bilateral handling and fingering. AR 19.

At step four the ALJ concluded that Plaintiff could perform her past relevant work as a waitress and fast food manager. Accordingly, the ALJ concluded that Plaintiff was not disabled at any time since her alleged disability onset date of October 11, 2017. AR 26.

### V. Issues Presented

Plaintiff asserts one claim of error: that the ALJ failed to properly weigh the opinion of her treating physician, Dr. Ali.

#### A. Applicable Law

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity. *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018). The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and

resolve evidentiary ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995). "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

For applications filed on or after March 27, 2017, the new regulations eliminate a hierarchy of medical opinions, and provide that "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, when evaluating any medical opinion, the regulations provide that the ALJ will consider the factors of supportability, consistency, treatment relationship, specialization, and other factors. 20 C.F.R. § 404.1520c(c). Supportability and consistency are the two most important factors and the agency will articulate how the factors of supportability and consistency are considered. *Id.* "Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Woods v. Kijakazi*, 2022 WL 1195334, (9th Cir. Apr. 22, 2022) at *6

### B. <u>Analysis</u>

From 2017 to 2020 Plaintiff's treating internal medicine physician, Dr. Ali, completed a series of "Physical Capacities" questionnaires for the CalWorks benefits program, variously opining that Plaintiff could never lift and/or carry 10 pounds; could sit, stand, and/or walk 0-2 hours

of an 8-hour workday due to severe degenerative disc disease with chronic radiculopathy; could never climb, balance, stoop, kneel, crouch, crawl, or reach; must alternate between sitting and standing every 30 minutes (*see, e.g.* AR 852–53); had significant manipulative limitations; would require an assistive device when standing and walking; would need to shift positions; should avoid operating vehicles that require foot controls and machines requiring repetitive hand movements; and would be absent from work more than four days per month. AR. 870–71.

The ALJ addressed the opinions as follows:

> The undersigned does not find Dr. Ali's opinions persuasive. As a matter of law, the Social Security Administration is not bound by any determinations of disability or functional capacities made under the CalWorks system (20 CFR 404.1504). Although these assessments may be considered to be authored by treating medical providers, the undersigned finds insufficient objective support has been cited in support of these opinions. There also is no function-by-function determination, with regard to the claimant's residual capacity. And, medical source and other opinions on issues that are reserved to the Commissioner, include whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (the listings); what an individual's residual functional capacity (RFC) is; whether an individual's RFC prevents him or her from doing past relevant work; how the vocational factors of age, education, and work experience apply; and whether an individual is "disabled" under the Social Security Act (the Act) (Social Security Ruling 96-5p). Such assessments which are part of a Worker's Compensation case, and which consider only an individual's ability to return to past work, therefore are insufficient under Title II and Title XVI disability determination – because there is no assessment of the individual's ability to sustain other competitive work in the national economy.
>
> Finally, these various reports rely on criteria used which is not the same as that used in determining disability under the Social Security Act and Regulations. The conclusions, observations and findings made in these reports therefore are considered to be of limited probative value. For all of these reasons, these assessments, albeit by treating sources, are not persuasive.
>
> Another medical source statement by Dr. Ali, completed in September 2020, indicated the claimant suffered from severe, chronic pain related to degenerative disc disease of the cervical and lumbar spine, associated with depressed mood, and she was incapable of even low stress jobs. Dr. Ali believed the claimant required an assistive device with occasional standing and walking. Her symptoms would constantly interfere with her attention and concentration. She could sit/stand/walk less than 2 hours in an 8 hour workday; she would need to shift positions at will; she could never lift and carry any weight; she could rarely look down; she could

occasionally turn her head right or left, look up, and hold her head in a static position; she could never twist, stoop, crouch, squat, climb ladders and stairs; she had significant limitations in using her hands and arms with reaching, handling, and fingering; and she would need to miss more than four days of work a month. The claimant would also need to avoid temperature extremes, operation of vehicles requiring foot controls, and operation of machines requiring repetitive hand movements. (Exhibit 15F).

The undersigned does not find this opinion persuasive. It is not supported by a scintilla of actual objective evidence. Dr. Ali failed to cite any findings such as range of motion, tenderness, straight leg raise, gait, or imaging scan results. Moreover, the opinion's extreme stance on her inability to lift or carry any weight, perform most postural activities, and have such extreme limitations in the use of her upper extremities are not consistent with the claimant's ability to get her children ready for school, feed her dogs, prepare meals, shop in stores, use the computer and phone, drive, and visit others. (Exhibit 4E).

### 1.  CalWorks; Worker's Compensation; Determinations reserved for the Commissioner

An ALJ "may not disregard a physician's medical opinion simply because it was initially elicited in a state workers' compensation proceeding, or because it is couched in the terminology used in such proceedings." *Booth v. Barnhart*, 181 F. Supp. 2d 1099, 1103 (C.D. Cal. 2002). Rather, the ALJ must evaluate workers' compensation opinions just as they would evaluate any other medical opinion and must "translate" workers' compensation terminology into Social Security terminology to accurately assess the implications of those opinions for the Social Security disability determination. *Id.*; *Soria v. Berryhill*, No. 1:18-CV-00089-SKO, 2019 WL 2448435, at *11 (E.D. Cal. June 12, 2019); *Herlinda C. v. Saul*, No. CV 19-2730 AGR, 2020 WL 6287716, at *4 (C.D. Cal. Oct. 27, 2020).

Here, Dr. Ali clearly addressed numerous functional capacities which are directly relevant to the RFC determination and which require no translation (weight lifting limits, postural activities, sit/stand/walk duration). Contrary to the ALJ's suggestion, the fact that Dr. Ali: 1) *also* opined on an issue ultimately reserved for the Commissioner (whether Plaintiff can work); and 2) completed the questionnaire *for the purpose* of determining Plaintiff's eligibility for a different disability

6

program governed by a different standard[2] (CalWorks), does not undermine the evidentiary value of the <u>subsidiary issues</u> on which Dr. Ali opined.

## 2.     **Lack of Objective Support**

Whether Dr. Ali supported his opinion with an explanation is a distinct issue from whether the record supported his opinion. The ALJ explained that "Dr. Ali failed to cite any findings such as range of motion, tenderness, straight leg raise, gait, or imaging scan results."

Dr. Ali referenced "severe DDD (degenerative disc disease) of the lumbar and cervical spine" which is a fairly descriptive but succinct reference to the imaging scan results. AR 852. The results cannot be encapsulated within the space provided on the form (which is comparable to the space provided on SSA's check-box questionnaires). Although Dr. Ali could have described some physical examination results, both Defendant and the ALJ mischaracterized his opinion somewhat in the repeated reference to chronic "radicular pain" when in fact Dr. Ali consistently used the word "radiculopathy", which is a broader term that can encompasses various symptoms and signs including, but not limited to, pain, numbness, weakness, and tingling.[3]

Plaintiff contends the ALJ erred in focusing exclusively on the four corners of Dr. Ali's opinion to determine its supportability and consistency with the record when the record indisputably shows objective abnormalities upon MRI imaging and clinical examination.

Although the point Plaintiff makes here has some merit, Plaintiff falls subject to the same criticism directed at the ALJ, a selective focus on a very limited amount of text at the expense of

---

[2] Interestingly, in explaining the various reasons why Worker's Compensation assessments are legally irrelevant, the ALJ explained that "Such assessments which are part of a Worker's Compensation case, and *which consider only an individual's ability to return to past work*, therefore are insufficient under Title II and Title XVI disability determination – *because there is no assessment of the individual's ability to sustain other competitive work in the national economy*." *Id.* (emphasis added). Ironically though, the ALJ's determination in this case was indeed based a finding that Plaintiff could perform past work as a fast food manager. Specifically, the analysis did not proceed to the step five consideration of the claimant's ability to sustain other work in the national economy. Thus, the distinction the ALJ emphasizes between Social Security and Worker's Compensation programs was never brought to bear in this case.

[3] https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy

the broader analysis. The ALJ did indeed describe all of the objective abnormalities Plaintiff emphasizes, but did not do so again specifically at the juncture where the ALJ addressed Dr. Ali's opinion. Further, the ALJ's assertion that Dr. Ali's opinion was "not supported by a *scintilla* of objective evidence" (emphasis added) is simply an unnecessary overstatement.

In short, the parties' competing arguments cut both ways. To Plaintiff's point, the Court is not limited to the four corners of Dr. Ali's opinion to find objective support for the same. Conversely, the Court is not limited to the ALJ's above quoted explanation (unpersuasive as it may be) for rejecting Dr. Ali's opinion when the ALJ provided a broader discussion that is equally applicable. Chiefly, at the last paragraph of the RFC analysis, the ALJ provided reasoning for adopting the reconsideration opinion of Dr. Steinsapir. That paragraph encapsulated essentially all of the applicable reasoning for the RFC:

> The undersigned finds Dr. Steinsapir's opinion more persuasive than Dr. Lee's opinion. The light exertional capacity with occasional postural limitations is supported by imaging scans of mild to moderate degenerative changes and treatment notes indicating stability of the claimant's chronic pain with minimal pain medication treatment. The greater capacity to lift and carry and stand and walk, as compared to Dr. Lee's more restrictive opinion, is supported by the claimant's weight loss following gastric bypass surgery. Despite the absence of evidence of ongoing carpal tunnel symptoms and the claimant's own denial of paresthesias or weakness, the undersigned gives the claimant's history of bilateral carpal tunnel syndrome status post releases the benefit of the doubt, such that the residual functional capacity reflects manipulative restrictions. Dr. Steinsapir's opinion is also consistent with the claimant's reported ability to perform daily activities independently, including her ability to get her children ready for school, prepare simple meals, wash and put away dishes, fold laundry, drive, shop in stores and on the computer, go online to speak with others, visit with others in person, and ***watch television***.

AR 26 (emphasis added).

### a. **Imaging**

Plaintiff emphasizes an MRI of the lumbar spine dated August 22, 2017 which revealed disc protrusion causing stenosis in the foramen and abutting of the L4 and L5 nerve roots. Br. at 8 (citing AR 382). A thoracic spine MRI dated August 2017 noted T8-T9 disc desiccation and 2.0

mm central disc protrusion indenting the ventral thecal sac with patent spinal canal and neural foramina. AR 385. An additional lumbar spine MRI dated July 17, 2020 noted a 4mm disc protrusion and mild facet arthropathy resulting in mild central canal narrowing, mild to moderate recess stenosis, and mild foraminal stenosis. AR 741-42.

Plaintiff also emphasizes an MRI of the cervical spine dated August 22, 2017 revealing disc protrusion causing mild foraminal stenosis, effacement of the exiting nerve root, and annular tearing at C5-6. Br. at 8 (citing AR 382 and 388). Similarly, Plaintiff emphasizes an MRI of the thoracic spine dated July 17, 2020, revealing disc protrusion touching the ventral cord resulting in mild central narrowing. *Id.* (citing AR 740). Importantly here, these qualitative descriptions of the spinal MRI pathology all described the same as mild, or mild to moderate. Hence the ALJ did accurately recite the content of these MRIs. AR 20-22. The imaging comported with the ALJ's subsequent explanation in the final paragraph of the RFC analysis that: "The light exertional capacity with occasional postural limitations is supported by imaging scans of mild to moderate degenerative changes and treatment notes indicating stability of the claimant's chronic pain with minimal pain medication treatment." AR 26. This explanation was equally applicable to the ALJ's reasoning for rejecting Dr. Ali's contrary opinion despite the fact that the ALJ did not also recite it in that section.

Plaintiff contends the imaging abnormalities are corroborative of her complaints of radicular pain and supportive of Dr. Ali's opinion as to the limitations attributable to that radicular pain. Although mild to moderate imaging abnormalities showing nerve impingement are certainly corroborative of some degree of radicular pain, they are not significantly suggestive of pain so severe that it would render Plaintiff unable to lift any amount of weight with any frequency, or unable to perform most postural activities with any frequency, or unable to sit/stand/walk more than 0-2 hours in an 8-hour work day.

### b.    **Clinical Findings**

Plaintiff emphasizes several clinical findings, including: 1) an August 17, 2017 exam noting decreased sensation in the upper and lower extremities, positive Spurling's test (a provocation sign indicative of cervical radiculopathy), moderate tenderness, and decreased range of motion (50% reduced lumbar and cervical ROM) (AR 374); 2) an October 31, 2017 examination to the same effect (AR 379–380); 3) a November 9, 2017 review of the thoracic spine imaging study deemed severe enough to warrant surgery (AR 735); 4) a March 28, 2018, exam noting decreased range of motion in the cervical and lumbar spine as well as spasticity and decreased motor strength (AR 695); 5) a July 15, 2018 exam noting similar findings in addition to moderately antalgic gait (AR 430); 6) similar findings noted on April 15, 2019 (AR 425-426); 7) pain management records noting positive straight leg raise, tenderness, and decreased motor strength (AR 962); and 8) epidural and facet joint steroid injections in the cervical and lumbar spine on May 1, 2019 and October 2, 2019 (AR 957-959; 964-969).

The ALJ acknowledged those same findings but also noted counterexamples on most of the same subjects (AR 21-24), including but not limited to: 1) a June 2018 pain management examination showing normal sensation in all four extremities, normal gait, ability to heel and toe walk, and normal joint range of motion[4] (Ex. 19F/17-19; AR 972–74); 2) an unremarkable physical examination in August 2018 (Ex. 4F/22-23; AR 52-53);  3) a February 2019 examination noting 5/5 strength in all major muscle groups[5] (Ex. 5F/9; AR 478); 4) a December 2018 visit noting "normal" and "negative" musculoskeletal findings[6] (Ex. 4F/14-15; AR 444-45); 6) a May 2019

---

[4] Granted, motor strength was in fact reduced (4/5) in three extremities which the ALJ mistakenly recited as "4/4."

[5] The examination was with an OB/GYN, which somewhat minimizes the evidentiary value of the musculoskeletal findings.

[6] On the one hand, the notes under "review of systems" were very sparse overall (generally one word each: negative), which might be suggestive of default or auto-filled findings, particularly where the visit was to address the recent rupture of an ovarian cyst (i.e. not a strong musculoskeletal nexus).  On the other hand, under "gastrointestinal" the provider noted the history of gastric bypass, and under "psychiatric" the provider noted "opioid addiction," which suggests that specific attention was given to each category (including musculoskeletal) and not auto-filled.

follow up for dyslipidemia[7] noting that Plaintiff largely denied musculoskeletal or neurological complaints such as stiffness, pain, numbness, paresthesia, or weakness[8]; and 7) an October 2020 emergency department visit (following a fall at home) which noted there were no motor deficits (Ex. 16F/1, AR 873).

In sum, the record did not contain overwhelming clinical examination findings (qualitatively or quantitatively) either supporting or detracting from the ALJ's assessed RFC for light exertional work, or Dr. Ali's assessed RFC for less than sedentary exertional work. However, the clinical examination findings could reasonably support both assessments. In such instances, affirmance is appropriate. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (explaining that if the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision). Additionally, these were not subjects so highly technical or unsusceptible to a layperson's understanding that the ALJ was required to defer to Dr. Ali's medical expertise. The imaging findings, although highly technical and dense, are accompanied by a severity description in laymen's terms, and were uniformly described as mild or mild to moderate. Further, clinical findings such as strength, sensation, range of motion, and gait, have self-evident relevance to functional capacities such as lifting, carrying, bending, stooping, standing, and walking.

### 2. Course of Treatment and Response to Treatment

---

[7] Again, the purpose for the visit had no neuromuscular nexus, which somewhat undermines its evidentiary value when determining the extent to which Plaintiff's spinal conditions limited her functional capacity.

[8] The ALJ correctly recited that Plaintiff "denied paresthesia or numbness, weakness . . .," but then subsequently stated that the exam "showed no deformities, equal strength," etc. AR 22-23 (emphasis added). It was a phone consultation, so likely all normal findings would have been based on Plaintiff's reports. Further, while paresthesia, pain, and numbness are symptoms which the patient could confirm or deny verbally, deformities and muscle strength grading are not. Those are clinical findings which require an in person examination and which a patient is not qualified to self-assess. It is questionable that Plaintiff would have been asked to do so, much less during a phone consultation for dyslipidemia. In any case, these anomalies were not so numerous or so egregious that they undermined the substantial evidence the ALJ cited in support of the RFC. Further, the impetus was on Plaintiff to take some initiative on this type of detail-oriented discussion set forth in footnotes 4-8 herein, or to otherwise undertake to challenge the clear factual basis upon which the ALJ rested her conclusions about the RFC as tied together in the last paragraph of the ALJ's analysis (AR 26).

The ALJ further described examinations documenting Plaintiff's course of treatment and treatment response: 1) epidural steroid injections in 2017[9] (Ex. 19F/21-23); 2) no musculoskeletal complaints as of October 2018 (Ex. 4F/18; AR 448); 3) August 2018 notation she was titrating off opioids with suboxone (for opioid dependence) she obtained on the street (Ex. 4F/22, Ex. 452) and, relatedly, a November 2018 notation indicating she was doing well on Buprenorphine (for opioid dependence)[10] (Ex. 4F/16; AR 446); 4) December 2018 and January 2019 visit notes indicating her pain level was "manageable" and "stable" (Ex. 4F/12, 14-15; AR 442, 444-45); 5) February 2019 annual physical at which the review of systems was "negative for arthralgias, back pain, limb pain, or myalgias"[11] (Ex. 5F/7; AR 476); 6) March 2019 exam noting "pain management adequate on current dose" and her back pain was reduced by 70%[12]; 7) April 2019 notation she was no longer on pain medication, and her carpal tunnel status post surgical release 10 years earlier was stable[13] (Ex. 3F/5-7; AR 424-2); 8) May 2019 visit notes stating she was "stable on current level of meds" (Ex. 4F/6, AR 436);  9) several similar notations from visits in April 2020, May 2020, June 2020, and July 2020 (although as discussed above she did report neck and back pain on other occasions during the same time period and received steroid injections in the cervical and lumbar spine on May 1, 2019 and October 2, 2019 (AR 957-959; 964-969); and, 10) an emergency department visit

---

[9] The specific date was not indicated but it was noted by August 2017 that "the benefits of the last spinal injection is now wearing off" with pain levels ranging from 6 out of 10 to 8 out of 10, though the reference to "wearing off" suggests there was initially at least some benefit to the injection. AR 978.

[10] It is questionable to suggest that voluntarily waning off of opioids indicates improvement in one's pain levels or underlying condition.  For obvious reasons a patient may want to wane off of a highly addictive controlled substance despite the presence of continued pain.  The Commissioner seems to imply two competing notions concerning opioid use: 1) that opioid dependence is a problem of a claimant's own making that overshadows painful conditions, and thus opioid dependence should not be rewarded with disability benefits, but conversely; 2) that wanting to wane off of opioids must mean the pain is not as bad as alleged.

[11] Which doesn't seem plausible.  A more likely explanation is her radiculopathy was not up for discussion at her annual physical which generally is earmarked for more general health and wellness (hence the alternative term "annual wellness exam"), diet and exercise guidance, comprehensive blood work, high cholesterol, hypertension, diabetes, etc. Here, pain management of the spinal conditions was largely under treatment elsewhere where she received a serious of epidural steroid injections in the cervical and lumbar spine.

[12] Which would altogether nullify the immediately preceding treatment note the ALJ described from one month earlier (February 2019) that was negative for back pain.  Moreover, if Plaintiff had no back pain, there would be no back pain to reduce by 70%.

[13] Which is somewhat undermined by the notation of thenar muscle wasting and 3 out of 5 grip strength.

in October 2020 for cervical, thoracic, and lumbar pain with tenderness but no acute findings on imaging and there was no record of a follow-up (Ex. 16F; AR 873-881).

Plaintiff contends that a treatment note dated November 9, 2017 indicates that the thoracic spine imaging (dated August 2017) was severe enough to warrant surgery.  AR 735.  Dr. Parsa noted that he reviewed the August 2017 thoracic spine MRI with plaintiff and then explained as follows:

> The patient is here for follow-up and continues to have pain symptoms. The most significant finding [sic] from imaging are in the thoracic spine as suspected from her first clinical visit. *Due to the presence of myelopathy, she would require surgical intervention. However since there potentially to [sic] pathologies in her thoracic spine, I will need further imaging to make recommendations*. Once her thoracic spine pathology is treated, she may then require further intervention on her lumbar and/or cervical spine.

AR 735 (emphasis added)

The commentary about the thoracic spine as italicized above is unclear.  Dr. Parsa first diagnosed myelopathy,[14] then states she "would" require surgical intervention, but then states he requires more imaging for reasons unclear and refers her for a myelogram (which does not appear to have taken place) and updated MRIs.  Thus, he may have been suggesting   that the disc bulge at T8-T9 might eventually compress the spinal cord resulting in myelopathy (i.e. requiring surgical intervention).  However, the radiology report itself did not diagnose myelopathy or cord compression.  The lone abnormality noted in the August 2017 report was T8-T9 disc desiccation and 2.0 mm central disc protrusion indenting ventral thecal sac (a membranous sheath which surrounds the spinal cord, but is not itself the spinal cord) with patent spinal canal and neural foramina.  AR 385.

---

[14] "Myelopathy is an injury to the spinal cord due to severe compression that may result from trauma, congenital stenosis, degenerative disease or disc herniation."
https://www.hopkinsmedicine.org/health/conditions-and-diseases/myelopathy

The updated thoracic spine MRI on July 17, 2020 revealed a 5mm disc protrusion touching the ventral cord resulting in <u>mild</u> central narrowing.  AR 740.  This would still seem to fall well short of myelopathy (severe central cord compression) which Dr. Parsa diagnosed <u>before</u> ordering a myelogram (which apparently never occurred), and <u>before</u> ordering updated MRIs, which ultimately did show progression to mild central cord compression though no such compression was noted on the MRI Dr. Parsa reviewed at the time of the myelopathy diagnosis.

In any event, there is no indication she was referred for surgical consultation or underwent surgery, and she testified she did not. AR 53.  Importantly, Dr. Parsa's isolated (and ambiguous) statement that her thoracic spinal pathology "would" warrant surgery pending updated imaging has limited evidentiary value.

In sum, there were certainly some anomalies with the ALJ's cited records as described in the footnotes above.  However, on balance the cited records reasonably support the ALJ's characterization that the records indicated stable chronic pain reasonably well managed with minimal treatment.  AR 26.

### 3.     Consistency with Plaintiff's Reported ADLs

Finally, as to the consistency between Dr. Ali's opinion and Plaintiff's reported activities of daily living, the ALJ explained as follows:

> Moreover, the opinion's extreme stance on her inability to lift or carry any weight, perform most postural activities, and have such extreme limitations in the use of her upper extremities are not consistent with the claimant's ability to get her children ready for school, feed her dogs, prepare meals, shop in stores, use the computer and phone, drive, and visit others. Exhibit 4E.
>
> It is noted that in her May 2019 Exertional Activities Questionnaire, the claimant described her average day as getting her children ready for school, feeding her dogs, washing dishes, putting away dishes, and folding light loads of clothes. She takes walks for 30 minutes or longer; the claimant can walk about 1/2 mile for exercise. (Exhibit 4E).
>
> Then, in her September 2019 Function Report, the claimant denied taking care of others, claiming her husband took care of the children and her husband and children

fed the pets. She denied performing any chores. The claimant alleged she could walk only to the mailbox and back before needing to rest. She also initially indicated she was always accompanied by her husband while outside, before stating she was able to shop without her husband. (Exhibit 10E).

Meanwhile, in her September 2019 3rd Party Function Report, the claimant's grandmother confirmed the claimant did take care of husband and children as much as she could. (Exhibit 9E/3).

Regardless of her inconsistencies, the claimant confirmed she does prepare simple meals, wash and put away dishes, fold light loads of laundry, drive, shop in stores, use a computer and phone, visit her grandmother, and walk half a mile for exercise regularly. (Exhibit 4E; 10E).

AR 25

The ALJ was relying on two exertional activities questionnaires completed by Plaintiff (Exs. 4E and 10E; AR 262–271, 309–321), and a third party questionnaire completed by her grandmother (Ex. 9E; AR 300–308). Plaintiff disputes the accuracy of the ALJ's discussion and the inferences the ALJ derived therefrom.

First, Plaintiff notes she did not report getting her children ready for school, but only waking them up as they are teenagers who don't need help getting ready, and it is in fact they who help her. Br. at 11, Doc. 14 (citing AR 263, 264, 267). The point is well taken.

Second, regarding feeding her dogs, Plaintiff contends that this does not undermine Dr. Ali's opinion. Plaintiff explains that even if she could lift a 10 pound bag of dog food sporadically during meal times, that does not speak to her ability to do so consistently throughout a workday in the context of competitive work. The point is not particularly persuasive as Dr. Ali opined she could never lift weight up to 10 pounds, sporadically or otherwise.

Similarly, Plaintiff generally contends that the remaining statements the ALJ cited from her exertional questionnaire when read in context are not in conflict with Dr. Ali's opinion. She states her reported activities were sporadic, spending no more than 20-25 minutes at one time such as washing dishes or doing light loads of laundry. AR 263–264. She further explains she reported

driving up to 30 miles and walking 30 minutes, which is within the bounds of Dr. Ali's opinion that she could sit, stand, and walk 0-2 hours in an 8-hour day.

Plaintiff is correct that the ALJ did appear to take some liberties in describing the responses from the exertional questionnaires. However, Plaintiff does not directly address each activity referenced and somewhat bypasses an important point the ALJ made about the lack of consistency in the responses across the exertional questionnaires. Further, even though the cited activities do not directly conflict with Dr. Ali's opinion, or suggest an exceptionally high level of functioning, they do suggest she was significantly more functional than alleged.[15] *See Valentine v. Commissioner Social Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009) (finding the ALJ satisfied the "clear and convincing" standard for an adverse credibility determination where claimant engaged in "gardening and community activities . . . evidence [which] did not suggest Valentine could return to his old job," but "did suggest that Valentine's later claims about the severity of his limitations were exaggerated.").

### VI. Conclusion

The ALJ's RFC for light exertional work with manipulative and postural limitations was supported by substantial evidence, namely: **1)** mild to moderate imaging findings; **2)** mixed findings upon clinical examination (in areas such as motor strength, range of motion, gait, and sensation); **3)** Plaintiff's course of treatment and response thereto (suggesting stable pain levels reasonably well controlled, despite necessitating spinal epidural injections and sporadically presenting with more distress to the ER after lengthy gaps between pain management follow ups); and, **4)** Plaintiff's reported activities of daily living. These facts substantially support the ALJ's assessed RFC for light exertional work and are equally applicable to the ALJ's rejection of Dr. Ali's contrary opinion

---

[15] The ALJ's reliance on Plaintiff's ADLs need not significantly move the evidentiary needle given the mild to moderate imaging findings, mixed clinical examination findings, and records demonstrating stable pain levels during the relevant period.

as to a less than sedentary exertional RFC—this despite the ALJ providing additional unpersuasive discussion when addressing Dr. Ali's opinion,  such as the fact that it was rendered for a CalWorks application (irrelevant), or the reference to  there not being even a "scintilla" of objective evidence to support the opinion (which was not consistent with the ALJ's own discussion throughout the remainder of the decision acknowledging significant and widespread imaging and clinical abnormalities of the spine).

## VII. Order

For the reasons stated above, substantial evidence and applicable law support the ALJ's conclusion that Plaintiff was not disabled.  Accordingly, it is ordered that the Commissioner's decision is affirmed.  The Clerk of Court is directed to enter judgment in favor of Defendant Commissioner of Social Security and against Plaintiff Joanna Faye Miranda.

IT IS SO ORDERED.

Dated:   **March 19, 2024**                                   **/s/ Gary S. Austin**
                                                                        UNITED STATES MAGISTRATE JUDGE